Argued and submitted May 4, 1984, affirmed April 17, reconsideration denied June 7, petition for review denied July 2, 1985 (299 Or 443)

# THORMAHLEN et al,
*Appellants,*

*v.*

# CITIZENS SAVINGS AND LOAN,
*Respondent.*

## (81-2560-J-3; CA A28839)

698 P2d 512

Dennis H. Elliott, Portland, argued the cause for

appellants. With him on the briefs was Elliott & Freedman, Portland.

Mark S. Wolfe, Portland, argued the cause for respondent. With him on the brief was Robertson, Huycke & Michele, Portland.

Before Buttler, Presiding Judge, and Warren and Van Hoomissen, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Plaintiffs brought this action for damages against defendant, their construction lender, contending that defendant breached its contractual and common-law duties to them by disbursing construction loan funds in excess of the percentage of completion of a project known as the Ravenwood Condominiums. They also sought rescission of two deeds of trust given to defendant to secure additional financing of the project. Defendant counterclaimed for foreclosure of the trust deeds.[1] At the close of plaintiffs' case, the trial court granted defendant's motion to dismiss plaintiffs' seven claims for relief.[2] After trial, the court entered judgment for defendant on plaintiffs' second amended complaint and, on defendant's counterclaims, entered a decree foreclosing the two trust deeds.

On appeal, plaintiffs contend that the trial court erred in dismissing their first two claims for relief and in refusing to admit certain testimony.[3] The underlying issue is whether defendant owed plaintiffs either a contractual or common-law duty to monitor the progress of the project and to limit its disbursement of the loan proceeds to the percentage of completion of construction. On the contract claim, both parties contended in argument on defendant's motion to dismiss that the meaning of the contract was for the court, and we cannot say that the court erred in deciding the question as so posed. On plaintiffs' common law duty claim, we conclude that defendant had no such duty. Accordingly, we affirm.

In 1979, plaintiffs began planning for the development of a 24-unit condominium project on real property they owned in Ashland. They sought financing for the project from defendant, located in Medford. Plaintiffs anticipated a sales

---

[1] Defendants also counterclaimed for damages for slander and filed a third-party complaint against the Homeowners Association of the Ravenwood Condominiums. Both the slander claim and the third-party complaint were abandoned.

[2] Plaintiffs' first four claims for relief were in the alternative and sought damages on various theories involving defendant's administration of the construction loan. Their fifth claim for relief sought cancellation of the trust deeds, and the sixth and seventh claims for relief sought damages for defendant's allegedly unlawful actions in delaying the closing of condominium sales by slandering title to the condominiums.

[3] Plaintiffs do not appeal the judgment foreclosing the two trust deeds.

price for the project, to be known as the Ravenwood Condominiums, of approximately 1.4 million dollars and sought financing in the amount of $849,000. Defendant agreed to lend $800,000, with $400,000 to be disbursed for each phase. Plaintiffs requested defendant to lend $542,600 on the first phase, and the balance on the second phase.

Defendant agreed, and on July 13, 1979, the parties executed a commitment letter, by which defendant agreed to lend a total of $800,000, to be disbursed during the two phases as requested by plaintiffs. That letter also stated, in part, that defendant's commitment to make the loan was subject to the following:

"2A.  Satisfactory periodic inspections of subject property during the construction process prior to each disbursement of loan funds. Inspections to be done by representatives of the mortgagee.

"* * * * *

"3F.  Signators to documents as set forth by mortgagee shall be Philip A. Thormahlen, Sharon C. Thormahlen, and Donald E.G. Gorman."

On August 27, 1979, plaintiffs and their contractor executed a form of construction loan agreement provided by defendant. That agreement provided, in pertinent part:

"The undersigned expressly covenants with
CITIZENS SAVINGS AND LOAN ASSOCIATION

hereinafter referred to as 'the Association,' and agrees in consideration of the granting of a loan by the Association, to do and perform the following acts and things:

"* * * * *

"SECTION 2.

"It is further understood:

"1.  That the Association is authorized to disburse funds under its control in said construction loan account, together with the net proceeds of the loan, only in proportion to its inspector's report of progress, or by Architect's or Superintendent's Certificate accompanied by a proper affidavit from the contractor.

"* * * * *

"3.  That the Association may, at any time, without consent of the undersigned, if in its opinion it becomes necessary

so to do, pay bills and/or complete said building or buildings in accordance with plans and specifications, etc., on file with it, using for such purposes, including therein the unexpended net proceeds of this loan, upon which funds the Association shall have a first lien for any one or more such purposes, but nothing herein contained shall be in any way construed as a covenant on the Association's part to so pay or complete.

"* * * * *

"6. The owner has accepted, and hereby accepts the sole responsibility for the selection of his own contractor and contractors, all materials, supplies and equipment to be used in the construction, and the Association assumes no responsibility for the completion of said building, or buildings, according to the plans and specifications and for the contract price. In the event that the funds on hand are found to be insufficient to erect the building and complete the same in accordance with the plans and specifications and any agreed extras, the owner shall place and hereby agrees to place such additional funds in his construction loan account as may be necessary to complete the building or buildings, according to such plans and specifications, plus any extras authorized by him.

"The above promises and agreements are made for the purpose of inducing CITIZEN SAVINGS AND LOAN ASSOCIATION of Medford, Oregon, to make a loan upon the following described property and improvements to be constructed thereon, to-wit: Ravenwood Condominiums, Ashland, Oregon."

A few days before the execution of the construction loan agreement, various other documents were also signed, including a note secured by a trust deed covering the real property to be developed.

From September through December, 1979, Teresa O'Connor, vice-president of defendant, was the person responsible for making project inspections. Although O'Connor had several years of banking experience, she had no experience in construction or in administering construction loans. The normal procedure was for plaintiff Sharon Thormahlen to submit a disbursement request to defendant, for defendant to issue a check as requested and for Mrs. Thormahlen to pay the amounts shown on the disbursement request.

Construction on the project began in the fall of 1979, and the first disbursement was made in September. Written reports were prepared for inspections of the project on September 20 and October 9, although no percentage of completion was calculated at that time. Approximately $65,700 was disbursed in October, and $90,000 in November. Sometime during the fall, defendant became aware of cost overruns on the project. O'Connor testified that she had several conversations with plaintiff Sharon Thormahlen in which Mrs. Thormahlen demanded that construction loan funds be disbursed to satisfy cost increases. Despite its position that the requests were unreasonable, defendant acquiesced in those demands. In early November, O'Connor met with plaintiffs' contractor to discuss cost overruns on the project. After the meeting, O'Connor wrote to plaintiffs, asking that they "take every caution not to expend funds over and above that which was originally estimated on your construction costs breakdown." She further advised that, if they would resubmit the amount of the land payment, approximately $36,000, to the loan account, the account would be brought back in line with the percentage of completion of the project. Plaintiffs complied with that request.

The project was inspected again on December 5, at which time O'Connor estimated that the first 12 units were 40 percent complete. No percentage of completion was calculated for the overall project. In her deposition, O'Connor calculated the percentage of completion on the total 24 units to be 26 percent, and admitted that the corresponding percentage of loan funds disbursed through December was 38 percent.

In January, 1980, plaintiffs requested that $117,000 be disbursed but, for the first time, defendant refused to honor the full request and authorized disbursal of only $105,000. Sharon Thormahlen testified that, at that time, O'Connor told plaintiffs that the full project was 62 percent complete. Also in January, plaintiffs received earnest money on each of the first 12 units, made the commitment to build the full 24 units and received authorization for the second phase of the loan.

In February, defendant re-appraised the project and advised plaintiffs that it was only 45 percent complete. Plaintiffs needed additional disbursements to cover cost increases

and performed their own inspection, informing O'Connor that they considered the project to be 65 percent complete. Despite its different calculations, defendant complied with a request for a disbursement of $150,000. At that time, plaintiffs revised their cost estimate of the project upward to approximately $975,000.

In early March, O'Connor told plaintiffs that the project was 75 percent complete. At the same time, however, Isom Davis, defendant's new inspector, told plaintiffs that the project was only 42 percent complete. O'Connor told plaintiffs that, in her view, the project was out of control. Presented with a disbursement request for $135,000, defendant said that it would fund only $45,000, because of the discrepancy between the percentage of completion and the percentage of loan funds disbursed. On defendant's recommendation, plaintiffs hired a consultant. They also fired their contractor and borrowed from other sources to make up the balance of the March subcontractor bills.

Throughout the succeeding spring, plaintiffs attempted to finish the project by borrowing additional funds from several institutions, none of which was willing to lend the required amounts. Finally, defendant agreed to lend the additional amounts, if sufficient security could be provided. Plaintiff Gorman borrowed an additional $175,000, secured by a trust deed covering an apartment house he owned, and plaintiffs Thormahlen borrowed $145,000, also secured by a trust deed covering an apartment house they owned. A condition of that loan was that the trust deeds could not be repaid out of the sale proceeds from the condominiums. At the close of the project, the total cost of completion was $1,971,091, while the total revenue received from the sale of the units was only $1,493,930.

Plaintiffs' expert witnesses testified as to the importance of keeping the percentage of completion in line with the percentage of disbursement of construction loan funds. Plaintiffs testified that, from September, 1979, through January, 1980, they were given no indication of the percentage of completion of the project and that, had they known in early December that the project was overdisbursed, they probably would have abandoned the second phase of it, thereby cutting losses as much as possible. They also presented testimony

showing what the extent of their losses would have been had the second phase been abandoned.

At the close of plaintiffs' case, defendant moved to dismiss the contract claim on the ground that, as a matter of law, the contract did not impose an affirmative duty on it to limit its loan disbursement in proportion to the percentage of completion of the project.[4] In opposing the motion, plaintiffs did not contend that the contract was ambiguous and that it was for the jury to decide what the parties intended. To the contrary, they contended that the contract was unambiguous and that, when the loan commitment and construction loan agreement are read together, they must prevail as a matter of law on defendant's contractual duty. In this court, they continue that argument and point out, correctly, that we are not bound by the trial court's construction of the written agreement. There is no parol evidence relating to what the parties intended, and the only apparent efforts by plaintiffs to adduce testimony that was excluded are assigned as sub-assignments to their first assignment of error.

■ The first sub-assignment is that the court erred in sustaining an objection to the following question to Sharon Thormahlen:

> "Q. All right. Can you tell us, as far as you were concerned, what documents comprised your agreement with Citizens Savings and Loan in connection with this loan?

The objection was that the question called for a determination that was for the court to make. Whether or not the court erred in sustaining it, the error, if any, was not prejudicial, because the court considered both the commitment letter and the construction loan agreement in ruling on defendant's motion to dismiss.

■ Plaintiffs' second sub-assignment claims error in sustaining defendant's objection to a question put to one of defendant's officers concerning whether inspections to determine the percentage of completion were for the benefit of both

---

[4] Defendant also contended that plaintiffs failed to segregate their claimed damages in such a manner that the jury could ascertain which damages were attributable to defendant's alleged conduct. The trial court also granted the motion to dismiss on that ground. Given our disposition of the case, we need not reach that question.

the lender and the borrower. The court properly sustained defendant's objection that the question called for a legal conclusion—the interpretation of the documents. Plaintiffs, however, contend that the evidence relates to defendant's common-law duty to plaintiffs, that the court had discretion under OEC 701 to admit lay opinion and that the court abused its discretion. There was no error.

Given the posture of the case at the time the court was asked to rule, and the position of the parties, it is clear that no jury question was presented. Neither party contended that the contract was ambiguous, but even if it were ambiguous, neither party offered evidence of intent. Each party asked the court to read the contract favorably to its position. The court did what it was asked to do—decide the question as one of law. Accordingly, unless we can say as a matter of law that the trial court's construction of the contract was not a permissible one and that the contract documents unambiguously imposed an affirmative duty on defendant to monitor the progress of the project and to limit its disbursement of the loan proceeds to the percentage of completion of construction, we cannot say that the trial court erred. We conclude that the contract documents do not clearly impose such a duty on defendant and that, therefore, there was no error.

■    In their second assignment, plaintiffs contend that the trial court erred in failing to conclude that defendant had a common-law duty to use reasonable care in disbursing loan funds and in refusing to admit expert testimony relating to defendant's alleged breach of that duty. Plaintiffs rely on four cases, which they contend impose such a duty: *Greenwade v. Citizens Bank of Oregon,* 50 Or App 395, 624 P2d 610 (1981); *Speights v. Ark. Sav. & Loan Ass'n.,* 239 Ark 587, 393 SW2d 228 (1965); *Prudential Ins. Co. v. Executive Estates,* 174 Ind App 674, 369 NE2d 1117 (1977); *Falls Lumber Co. v. Heman,* 114 Ohio App 262, 181 NE2d 713 (1961).

In *Greenwade v. Citizens Bank of Oregon, supra,* however, the question was whether the trial court properly admitted evidence of an oral agreement between a lender and a borrower, whereby the lender agreed to manage the loan fund to ensure that disbursements were made commensurate with the stage of completion of the building. The issue was

whether the parol evidence rule barred admission of evidence of the oral agreement. In concluding that evidence of the oral agreement was properly admitted, we had no occasion to consider any potential common-law duty of the lender. Thus *Greenwade,* at best, stands for the proposition that a lender may be held to an agreement that it would manage the loan fund to assure that disbursements were made commensurate with the stage of completion of the project.

In each of the other cases relied on by plaintiffs, the court found that, as in *Greenwade,* the lender had voluntarily assumed duties in connection with the disbursement of funds. In *Speights v. Ark. Sav. & Loan Ass'n., supra,* the lender agreed to act as the borrowers' "agents and make final disbursement of the said loan proceeds in accordance with the terms as agreed upon by us this date." It received orders from the borrowers not to pay the contractor until all of the subcontractors' bills were satisfied, but paid the contractor anyway, leaving unsatisfied subcontractors. The court concluded that the lender had failed to exercise reasonable care in protecting the interest of the mortgagors. In *Falls Lumber Co. v. Heman, supra,* after finding that the mortgagee had orally agreed to protect the mortgagors from any claims that would cause them to pay more than the contract amount, the court concluded that the mortgagee had failed to exercise ordinary care in disbursing funds without obtaining releases in compliance with Ohio's mechanic's lien laws.

Finally, in *Prudential Ins. Co. v. Executive Estates, supra,* the court found three bases for the imposition of a duty on a mortgagee to obtain full releases from third parties prior to its distribution of loan proceeds at closing: (1) an express agreement by the mortgagee's agent that "there would be no liens or encumbrances on that real estate because [the mortgagee] would take care of it;" (2) the custom and practice prevailing in the community, and (3) principles of equity and agency law that imposed fiduciary duties on the mortgagee to obtain releases for the protection of the mortgagor.

None of those cases is applicable here, because in each of them the lender disbursed funds directly to the contractor and did so without obtaining releases from subcontractors. Here, disbursements were made to plaintiffs, who paid the bills listed in their request for disbursement, and

there is no claim that defendant breached any duty, contractual or otherwise, to plaintiffs by not obtaining releases from the contractor or subcontractors. Plaintiffs have not cited any case which holds that a construction lender has, independently of contract, a common-law duty to limit disbursements to the borrower to an amount equal to the percentage of completion of the work.

The majority rule appears to be to the contrary and is stated in *Rudolph v. First Southern Federal Sav. & Loan,* 414 So2d 64, 71 (Ala 1982):

"* * * We hold that no duty is imposed upon a lender of a construction loan to exercise reasonable care in its inspection of the borrower's premises, even where the borrower pays the lender's inspection fee, unless the lender voluntarily undertakes to perform such inspection on behalf of and for the benefit of the borrower.

"* * * * *

"Because the lender may exercise its independent right of inspection for its exclusive benefit, and thus incur no liability to the borrower for its negligent inspection, the burden is on the borrower, seeking to impose liability, to prove the lender's voluntary assumption of activities beyond those traditionally associated with the normal role of a money lender."

*See generally Murry v. Western American Mortg. Co.,* 124 Ariz 387, 604 P2d 651 (1979); *Armetta v. Clevetrust Realty Investors,* 359 So2d 540 (Fla App), *cert den* 366 So2d 879 (Fla 1978). The difficulties with imposing a common-law duty on a construction lender to inspect the work before disbursing funds are many. For example, if that duty is imposed independently of contract, should it extend to the quality of the workmanship and materials and to compliance with building codes as well as to the extent of completion? *See Butts v. Atlanta Federal S & L Ass'n.,* 152 Ga App 40, 262 SE2d 230, 232-33 (1979).

It appears from the authorities that, traditionally, inspections by construction lenders to determine the percentage of completion of the work before disbursing funds are undertaken to ensure that the lender's security is protected adequately, not to provide technical assistance to the borrower in determining the quality of work or the stage of completion of the project. Thus, in the absence of the lender's

agreeing to go beyond its ordinary function in making inspections, the borrower must look elsewhere for the protection it desires.

Plaintiffs here have failed to establish that defendant assumed any role in the construction of the project beyond that of an ordinary construction lender. To the contrary, the evidence shows that plaintiffs monitored the project; that they, not the contractor, requested each disbursement; and that the funds were disbursed to plaintiffs for payment of the items for which they had requested the funds. It also shows that, on more than one occasion, they insisted that defendant release funds in excess of what it considered reasonable so they could take care of cost overruns. The trial court did not err in granting defendant's motion to dismiss plaintiffs' second claim for relief or in refusing to admit expert testimony regarding defendant's breach of the alleged common-law duty.

Affirmed.