604 A.2d 521

**Robert I. PARKER, et ux.**

v.

**The COLUMBIA BANK, et al.**

**No. 1109, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

April 14, 1992.

348

Albert D. Brault (Brault, Graham, Scott & Brault and Stephen H. Ring, on the brief), Rockville, for appellants.

James T. Heidelbach (Brian C. Parker and Gebhardt & Smith, on the brief), Baltimore, for appellees.

Argued before WENNER, DAVIS and MOTZ, JJ.

MOTZ, Judge.

In these difficult economic times with falling real estate prices, lender liability suits have become one of the few "growth industries." This appeal is a part of that "industry," involving, as it does, a number of issues concerning a bank's duties and responsibilities to its borrowers. This case arises out of two actions, now consolidated, relating to a residential construction loan secured by appellants, Robert and Margaret Parker ("the Parkers"), from appellee, The Columbia Bank ("Columbia"). The Parkers appeal the order of the Circuit Court for Montgomery County granting Columbia's motion to dismiss[1] the Parkers' suit for fraud, fraudulent concealment, negligent misrepresentation, negligence, breach of fiduciary duty, and breach of contract; and the order of that court ratifying the foreclosure sale by Columbia of real estate used by the Parkers to secure this construction loan.

### (i)

During 1988, the Parkers, physicians employed at the National Institutes of Health, began to look for a larger

---

**1.** Although the Parkers' suit against Columbia was disposed of on a motion to dismiss, the Parkers' complaint, which had been amended once, is extremely detailed; it contains seven counts and more than 100 paragraphs. Moreover, attached to the complaint are five exhibits, including the construction contract, the land contract, the residential construction loan agreement, an affidavit of Robert Parker, and Robert Parker's answers to Columbia's interrogatories to him in the related foreclosure action. These attachments are all incorporated into the complaint. *See* Md.Rule 2–303(d). Accordingly, the circuit court had before it a far more developed factual record—at least from the Parkers' perspective—than is usually available on a motion to dismiss. The statement of the facts set forth herein is entirely based on the complaint and the attachments to it. In reviewing the grant of a motion to dismiss, we must assume the truth of all well pleaded facts. *Wimmer v. Richards*, 75 Md.App. 102, 105, 540 A.2d 827, 829 *cert. denied*, 313 Md. 506, 545 A.2d 1344 (1988). *See also Flaherty v. Weinberg*, 303 Md. 116, 136, 492 A.2d 618, 628 (1985). We limit our consideration, however, to allegations of fact and inferences deducible from them and not "merely conclusory charges." *Yousef v. Trustbank*, 81 Md.App. 527, 536, 568 A.2d 1134, 1138 (1990) (*quoting Berman v. Karvounis*, 308 Md. 259, 265, 518 A.2d 726, 729 (1987)).

home in Montgomery County. After "many drives throughout Montgomery County" they met George Evangelos Paleologos ("Paleologos"), a builder who had contracted with friends of the Parkers to construct a custom home in Brookeville, Maryland. Paleologos introduced the Parkers to a project in which his construction company, Evangelos Enterprises, Ltd. ("Evangelos"), planned to build a group of seven custom homes in a subdivision known as "Brookeville Farms." Dr. Parker[2] spoke with Paleologos and other subdivision buyers, "observed the displays" in Paleologos' sale office and "the work under way" on Paleologos' own house. From these conversations and observations, Dr. Parker "gained the impression that he [Paleologos] was competent." After several meetings with Paleologos, the Parkers believed that Paleologos "could build the house" the Parkers "wanted at a price [they] could afford."

On September 21, 1988, the Parkers entered into a contract with Evangelos for the construction of a 5,000–square–foot house at a cost of $385,000. The Parkers "selected a floor plan and numerous features that customized the house to meet the specific needs of [their] family. The construction documents called for more than 5,000 square feet of finished living space, 7 bedrooms, 5 full and 2 half baths, 10–foot ceilings on the first floor, a soaring cathedral ceiling 27 feet high in the family room, 3 fireplaces, huge arched windows, and other features that made this the home [the Parkers] felt [they] could keep forever." In order to verify that Paleologos could build this house for $385,000, Dr. Parker asked him if he could and the builder "said yes."

On October 15, 1988, the Parkers entered into a contract with the "Brookeville Development Partnership" for the purchase, at the price of $160,000, of the lot on which the house was to be built. While the land contract stated that the seller of the property, the Brookeville Development

---

2. References herein to Dr. Parker in the singular are to Dr. Robert Parker.

Partnership, "is not involved in the construction or development of the home," Paleologos signed the land contract on behalf of the seller. The land contract, but not the construction contract, included a provision that its execution would be contingent on the Parkers' obtaining a loan to finance the purchase.

Over the following weeks, the Parkers sought a lender to finance the purchase of the land, the construction of the house, and the mortgage. They spoke with representatives of three banks regarding financing. In late October and early November, they contacted Mr. Clements, a loan officer at Sandy Spring Bank, who had provided funding for two other couples, friends of the Parkers, in the Brookeville Farms development. Dr. Parker told Mr. Clements that he was "looking for financing that would provide 80% of the appraised value, which was expected to be between $700,-000 and $750,000." As Dr. Parker recognized, "this would result in financing essentially 95–100% of the construction and land costs." Mr. Clements, according to Dr. Parker, "did not believe his Bank's loan board would allow such a financing package." Accordingly, the Parkers submitted no loan application to Sandy Spring. Dr. Parker next spoke to Mr. Bollinger at First Annapolis Savings & Loan. Paleologos, who told Dr. Parker that "he was also dealing" with First Annapolis, referred Dr. Parker to that institution. Again, Dr. Parker "asked for a package that would essentially finance 95% of the construction and land costs, based on 80% of the appraised value as completed." Again, the loan officer indicated that the "Bank could not do that." Again, no loan application was submitted.

Dr. Parker then spoke with Michael T. Galeone, a senior vice president of Columbia Bank.[3] On January 7, 1990, the Parkers made an application to Columbia for a construction

---

**3.** The record does not reflect who referred the Parkers to Columbia or how they happened to come to it for the loan; they do not allege that Paleologos referred them to Columbia. Apparently the Parkers had no prior relationship with Columbia.

loan. Dr. Parker again explained that he "was looking for financing on 80% of the appraised price rather than 80% of the purchase price." Moreover, Dr. Parker alleges he told Galeone that "if the house could not be built for this, we could not proceed with the project." Mr. Galeone asked Dr. Parker "what he knew about" Paleologos and "how" Dr. Parker "came to know" Paleologos. Dr. Parker, in response, related his conversations with Paleologos and observations of Paleologos' own house and sales displays, which are outlined above. Dr. Parker provided Galeone with Paleologos' address and telephone number so Columbia could do its own check on the qualifications of the builder.

The Parkers allege that, over the next two months, they spoke with Galeone on numerous occasions and he "intentionally cultivated a relationship of trust and confidence with" them and they "came to regard him and Columbia as an adviser and consultant with respect to the project." They further allege that, to induce them to enter into a construction loan with Columbia, Galeone represented that: (1) he was "experienced in the placement and administration of loans similar to the construction loan needed for the house" while in fact he had never administered a loan involving draw payments to a builder; (2) Columbia had "thoroughly investigated" Paleologos and determined he was qualified to undertake this project, while in fact this investigation was "perfunctionary" and overlooked information which would show he was not qualified; (3) Galeone and Columbia would protect the Parkers' interest, as well as Columbia's, throughout construction of the house, while in fact Galeone had no intention of protecting the Parkers' interest unless it coincided with Columbia's; (4) construction draws would only be issued after Columbia had obtained inspections to insure that work had been done in accordance with the draw schedule, while in fact Columbia intended to advance funds, if requested by Paleologos, ahead of the draw schedule and regardless of inspections; and (5) in response to the Parkers' specific inquiries, "Galeone told them that in the event of a default by the builder,

Columbia would find or recommend another builder and would see that the house was completed within budget," while in fact Columbia intended to provide no such protection to the Parkers.

On March 3, 1989, Columbia issued a commitment letter to the Parkers for financing the project. The bank undertook to provide financing for 96% to 97% of the costs of the project, *i.e.*, the Parkers would provide $21,290 and Columbia would loan them $529,000. The Parkers accepted Columbia's offer of financing the next day, March 4, 1989. On March 17, 1989, the Parkers and Columbia entered into a written construction loan agreement in the amount of $529,-000 to cover the Parkers' purchase of the land and the construction loan. They allege that they had "little or no experience in matters relating to real estate," that Galeone knew this, and that "but for" Galeone's representations set forth above, they "would not have entered into the loan agreement with Columbia." At closing, Columbia disbursed $234,290 of the loan proceeds to the Parkers, $85,000 of which was paid by the Parkers to Evangelos and the remainder of which was used by the Parkers to pay the balance of the purchase price for the land.

In administering the loan, Columbia did not adhere to the draw schedule set forth in the Parkers' construction contract with Evangelos. The Parkers allege in their amended complaint that another draw schedule was substituted by Columbia and Evangelos without the Parkers being advised of its terms, but Dr. Parker explains in his affidavit that he and Galeone did discuss amending the draw schedule.[4] In

---

4. As indicated in the text above, precisely what the Parkers are alleging as to the draw schedule is unclear. Dr. Parker's affidavit and answers to interrogatories are not entirely consistent with the assertions in the amended complaint. For purposes here, we assume that the Parkers are, as they seem to allege in their complaint, asserting that Galeone "assured them that construction draws would only be issued after Columbia obtained inspections to insure that the work had been done in accordance with the [only approved] draw schedule" when, in fact, Columbia "intended to advance funds to the builder at

any event, the construction loan entered into by Columbia and the Parkers provides that disbursements of the construction loan "will be made by two party checks payable to both the Borrowers and their general contractor, unless Lender exercises its rights hereunder to make disbursements directly to any party." [5] Columbia, in fact, released all loan draws to the Parkers in the form of a two-party check payable to the Parkers and Paleologos as follows: $85,000 at closing on March 17, 1989; $55,000 on May 31, 1989; $50,000 on June 29, 1989; [6] and $110,000 on September 18, 1989. In addition to personally signing each draw check, the Parkers talked with Paleologos "at least 2–3 times a week from mid-March, 1989 through mid-November, 1989." They also frequently talked with other families who were having houses built by Evangelos in Brookeville Farms.

At the same time that Columbia was developing its relationship with the Parkers, it was, according to the amended complaint, "developing a relationship" with Paleologos and Evangelos in order to bring Columbia significant lending business from the builder. None of the details of how this "relationship" was developed are set forth in the complaint except that it is alleged that "one or more" managing agents of Columbia obtained construction services from Paleologos and Evangelos during 1989 "at little or no charge." It is not alleged, however, that either Paleologos

---

closing and later dates, ahead of the [only approved] draw schedule and regardless of draw inspections."

**5.** The Parkers similarly allege that Galeone advised them that, in obtaining inspections, Columbia would look out for both its own interests and theirs while, in fact, the construction loan agreement provides that "any action taken by Lender in making inspections ... will be taken by Lender and by Lender's Inspector for their own protection only, and neither Lender nor Lender's Inspector shall be deemed to have assumed any responsibility to Borrowers ..."

**6.** Columbia agreed to release the June 30, 1989 draw early after receiving written authorization from the Parkers acknowledging that all work had not been completed but requesting that the draw nonetheless be released.

or Evangelos had any banking relationship with Columbia until March 10, 1989, after Columbia had offered, and the Parkers had accepted, financing. On that date, Evangelos opened an account with Columbia by depositing $500. Over the course of the summer, nearly 100 checks drawn upon that account were returned for insufficient funds. On August 15, 1989, Columbia approved a line of credit to Evangelos in the amount of $250,000, which was immediately drawn upon and exhausted within a day. During the next four months, another seventy checks drawn on the Evangelos account were returned for insufficient funds; however, all required interest payments were made on the $250,000 line of credit until January 1990. Columbia did not contemporaneously disclose any of its transactions with, or information about, Paleologos to the Parkers; the Parkers allege that these nondisclosures are fraudulent.

After the last draw, in September 1989, Evangelos performed little, if any, additional work on the Parkers' house. The Parkers assert that as of that date, although 80% of the construction loan funds had been paid, the project was only 40% complete. In September, Paleologos advised Columbia and the Parkers that he needed additional financing in order to proceed with the project and that he intended to use his residence and adjacent land as collateral. Dr. Parker asked Galeone to have the bank's attorneys examine the builder's condition; he asserts that he repeated this request weekly for six weeks and Galeone repeatedly refused it, stating that "the value is in the ground," and there was nothing to worry about. In November 1989, when the Parkers received a supplier's notice of intent to file a mechanic's lien, they asked Paleologos and Galeone about the builder's financial status. Galeone told Dr. Parker that he "knew nothing of" the liens and "would look into it." Paleologos told Dr. Parker that he was experiencing a cash-flow problem but was seeking refinancing to continue the project and that the "lien would be taken care of." Dr. Parker spoke the next day to Galeone who purportedly reassured him;

Dr. Parker then relayed to Galeone the builder's assurances.

In February, 1990, the Parkers learned that in order to complete the project according to its original specifications and to build the necessary road mandated by county regulations, a sum of approximately $350,000 would be necessary, in addition to the existing construction balance of $300,000 and the land loan of $144,000. Even if this amount was reduced by $160,000 in proceeds from their former home, the remaining balance of $634,000 was "far beyond Plaintiffs' means" and "substantially higher than the $385,000 mortgage balance originally contemplated." The Parkers ceased making payments on their loan to Columbia.[7] The Parkers assert that if Columbia had not "engaged in the misrepresentations, concealments and silence" alleged in the complaint, they would never have entered into the loan agreement and/or "would have timely undertaken steps to investigate further and would have sought competent professional assistance to salvage the project within budget" and thereby avoided thousands of dollars in damages.

In November, 1990, the Parkers filed a complaint against Columbia for fraud, fraudulent concealment, negligence, negligent misrepresentation, breach of fiduciary duty, and civil conspiracy. They subsequently amended their complaint to include as defendants Galeone and John M. Bond, a director of the bank, and to add counts for fraud in the inducement and breach of contract. On May 24, 1991, the action was dismissed.[8] Also in November, 1990, Galeone as trustee and Louis J. Ebert as substitute trustee acted to foreclose on a deed of trust, which encumbered the Parkers' building lot and the partially completed house. The Parkers

---

7. During March, April, and May of 1990, Evangelos, Paleologos and the Brookeville Partnership each became debtors in Chapter 7 proceedings in the United States Bankruptcy Court.

8. The circuit court afforded the Parkers the opportunity to amend their complaint once again; they did not to avail themselves of this opportunity.

sought an interlocutory injunction and a stay of the fore-
closure sale, which were denied. After the foreclosure sale,
the Parkers filed exceptions to the trustees' report of sale,
which were overruled after a hearing on the merits. The
Parkers appealed the order to dismiss, except for the dis-
missal of the civil conspiracy count, and the order ratifying
the foreclosure sale.

(ii)

Many of the counts in the Parkers' complaint involve
their central claim that special circumstances exist here
which trigger a duty on the part of appellees to the Par-
kers; two counts, however, are not premised on any claim
of duty. These are: fraud (including fraudulent misrepre-
sentation and fraudulent inducement) and breach of con-
tract. We consider these counts first.

In order to recover on a claim for fraud, a plaintiff
must show: (1) that the defendant made a false representa-
tion; (2) that its falsity was either known to the defendant,
or the misrepresentation was made with such reckless indif-
ference to the truth as to be equivalent to actual knowl-
edge; (3) that it was made for the purpose of defrauding
the person claiming to be injured thereby; (4) that such
person not only relied upon the misrepresentation, but had a
right to rely upon it in the full belief of its truth, and would
not have done the thing from which the injury had resulted
had not such misrepresentation been made; and (5) that
such person actually suffered damage directly resulting
from such fraudulent misrepresentation. *Martens Chevro-
let, Inc. v. Seney,* 292 Md. 328, 333, 439 A.2d 534, 537 (1982)
(*quoting Gittings v. Von Dorn,* 136 Md. 10, 15–16, 109 A.
553, 554–555 (1920)). It seems clear that the Parkers'
allegations, if proved, do satisfy the second, third, and fifth
elements of a cause of action for fraud. Accordingly, we
turn our attention to the first and fourth elements.

In order to constitute a "false representation," a
statement must be a misrepresentation of material fact.
*Snyder v. Herbert Greenbaum & Associates,* 38 Md.App.

144, 148, 380 A.2d 618, 621 (1977). It cannot be an "estimate" or "opinion," *id.* at 149, 380 A.2d at 622, or "puffing." *Polson v. Martin,* 228 Md. 343, 346, 180 A.2d 295, 296–297 (1962). *See also Howard v. Riggs Nat'l Bank,* 432 A.2d 701, 706 (D.C.1981) (bank officer's recommendation to customer of contractor whose work was "very good ... very beautiful" did not constitute misrepresentation of fact). Galeone's alleged misrepresentations as to his own experience in loan administration and Paleologos' qualifications and the September, October, and November assurances that "the value is in the ground" and there is "nothing to worry about," clearly fall in the category of "opinion" rather than fact. *See, Snyder,* 38 Md.App. at 148, 380 A.2d at 621; *Howard,* 432 A.2d at 706. Moreover, the assurances made in the fall are very similar to the "puffing" statements discounted in *Polson,* 228 Md. at 346–347, 180 A.2d at 297. (Just as Galeone refused to ask bank lawyers to investigate Paleologos because the "value was in the ground," the seller in *Polson* told the buyer that he would not give a guarantee because the seller would not "need one" since the house was built according to the code specifications).

█ The remainder of the representations—that Columbia would protect the Parkers, that Columbia would permit construction draws only after inspections to be sure that work had been done in accordance with the approved draw schedule, and that Columbia would provide a new builder to construct the project at the contracted price if Paleologos defaulted—do, however, constitute statements of fact. These statements reflect expressions of future conduct, but they also reflect a present intention to perform those future acts. Maryland law is clear that, while "fraud cannot be predicated on statements that are merely promissory in nature, or upon expressions as to what will happen in the future," *Levin v. Singer,* 227 Md. 47, 63, 175 A.2d 423, 431–432 (1961); *see also Howard v. Riggs Nat'l Bank, supra,* 432 A.2d at 706, "the existing intention of a party at the time of contracting is a matter of fact" and "fraud may be

predicated on promises made with a present intention not to perform them." *Levin, supra,* 227 Md. at 63–64, 175 A.2d at 431–432. *See also Tufts v. Poore,* 219 Md. 1, 147 A.2d 717 (1959); *Bocchini v. Gorn Management Co.,* 69 Md.App. 1, 21, 515 A.2d 1179, 1189–1190 (1986).

Nor do we believe that the three remaining alleged misrepresentations can be dismissed on the ground that there was no reasonable reliance on them which resulted in injury. Reasonable reliance is one of the most slippery aspects of a fraud case. It is particularly slippery here because, since the Parkers had entered into a construction contract with Paleologos months *before* applying for a loan from Columbia, it would be exceedingly difficult for them even to allege that they reasonably relied upon any representations by Columbia in contracting with Paleologos. *Compare Yousef v. Trustbank,* 81 Md.App. 527, 536, 568 A.2d 1134, 1138 (1990); *Garner v. Hickman,* 709 P.2d 407, 409–10 (Wyo.1985). This is not, however, what the Parkers allege. Rather, they allege that they reasonably relied upon Galeone's representations in determining whether to contract with Columbia for the loan; that, in fact, their land contract had a financing contingency; and that, in any event, but for Galeone's representations, they would not have entered into the loan agreement with Columbia and incurred the damages resulting from its mismanagement of the loan.[9]

In determining if reliance is reasonable, a court is required to "view the act in its setting, which will include

---

9. Of course, in assessing whether reasonable reliance on the misrepresentations *resulted in the injury claimed,* the fact that the Parkers had already entered into land and construction contracts with Paleologos can be considered. The Parkers do not allege *how,* in the absence of any financing contingency in the construction contract, and the fact that every draw check was signed by them and they frequently talked with the builder during construction, they were injured by Galeone's representations. The Parkers do, however, allege damage caused by these misrepresentations and Columbia does not make any argument to the contrary on this point. Accordingly, at this stage in the proceedings, we cannot find, as a matter of law, that no damage resulted from reliance on Galeone's alleged misrepresentations.

the implications and promptings of usage and fair dealing." *Giant Food, Inc. v. Ice King, Inc.*, 74 Md.App. 183, 192, 536 A.2d 1182, 1186, *cert. denied*, 313 Md. 7, 542 A.2d 844 (1988) (*quoting Glanzer v. Shepard*, 233 N.Y. 236, 240–41, 135 N.E. 275 (1922) (Cardozo, J.)). The Parkers are well educated, professional people. They specifically allege, however, that they had little or no experience in real estate transactions; had never built a custom home; were relying on Columbia's counsel, advice and representations regarding all aspects of the project that related to financing; *and* that Columbia and its agents knew of the Parkers' lack of sophistication and reliance. A commercial borrower's reliance on these sorts of representations (particularly that the bank was protecting the borrower's interest and would provide a new builder to construct the project at the contracted price if the original builder defaulted) might well be unreasonable as a matter of law. We cannot find, at this stage in the proceedings, however, that reliance on these representations by the Parkers, who were not commercial borrowers but allegedly unsophisticated and inexperienced residential borrowers, is unreasonable as a matter of law.

■ Columbia asserts that all three remaining representations are contradicted "by the express terms" of the loan agreement between Columbia and the Parkers and so parol evidence as to them must be rejected. *See Trotter v. Lewis*, 185 Md. 528, 45 A.2d 329 (1946) (written contract merges all prior and contemporaneous negotiations on the subject matter of the contract). The bank concedes that a "limited exception to the parol evidence rule permits the introduction of promissory fraud to establish that a written contract was fraudulently induced." *See Schmidt v. Millhauser*, 212 Md. 585, 130 A.2d 572 (1957). Citing cases from other jurisdictions, Columbia maintains, however, that courts have "generally held" that this "limited exception" is not applicable, and that "parol evidence of promissory fraud may not be introduced to contradict the express terms of the written contract."

Our review of out-of-state case law on the subject indicates that courts are divided on the question. Some jurisdictions have held parol evidence cannot be introduced to prove a representation "directly at variance" with a writing. *See, e.g., Davis v. Gulf Oil Corp.,* 572 F.Supp. 1393, 1400–01 (C.D.Calif.1983) (applying California law). *See also Runnemede Owners, Inc. v. Crest Mortgage Corp.,* 861 F.2d 1053, 1058–59 (7th Cir.1988) (applying Illinois law). Other courts have expressly rejected this view. *See, e.g., Delta Services & Equipment, Inc. v. Ryko Mfg. Co.,* 908 F.2d 7, 12 (5th Cir.1990) (applying Iowa law) (if fraud is alleged, parol evidence may be considered which "adds to, varies or contradict the express terms of the written contract"); *Tandy Brands v. Harper,* 760 F.2d 648, 651, n. 1 (5th Cir.1985) (applying Texas law) ("fraudulent statements made in the inducement of a contract are admissible regardless of whether they contradict" its written terms); *Wilburn v. Stewart,* 110 N.M. 268, 270, 794 P.2d 1197, 1199 (N.M.1990). Although this precise question has never been addressed in Maryland, both the Court of Appeals and this court have cited Professor Corbin to the effect that, in determining issues of fraud, "there is no parol evidence rule to be applied." *Whitney v. Halibut, Inc.,* 235 Md. 517, 527, 202 A.2d 629, 633 (1964); *Smith v. Rosenthal Toyota, Inc.,* 83 Md.App. 55, 63, 573 A.2d 418, 422, *cert. denied,* 320 Md. 800, 580 A.2d 219 (1990). Accordingly, we do not believe that, in Maryland, the parol evidence rule bars evidence as to any assertedly fraudulent misrepresentations.[10]

---

**10.** In any event, only one of the remaining alleged misrepresentations is expressly contradicted by the written loan agreement. The loan agreement provides that: (1) any actions taken by Columbia to monitor the progress of construction or inspect the builder's work are for Columbia's benefit only; (2) loan advances will be made by two-party checks payable to both the Parkers and the builder; and (3) Columbia may advance additional funds, even in excess of the face amount of the loan, if necessary to complete the Parkers' house. The first of these statements does seem to contradict directly the Parkers' allegation that Galeone represented that Columbia could protect the Parkers' interest as well as its own. The second, particularly combined with the fact that all draw checks were admittedly signed by the

■ The terms of a written contract can, of course, be used as evidence of the reasonableness of the Parkers' reliance upon alleged misrepresentations contrary to those terms. *See Entre Computer Centers, Inc. v. FMG of Kansas City, Inc.*, 819 F.2d 1279, 1286 (4th Cir.1987), *overruled on different grounds, Busby v. Crown Supply, Inc.*, 896 F.2d 833 (4th Cir.1990) ("a person cannot reasonably rely upon ... allegedly fraudulent statements made in the face of plainly contradictory contractual language"). In light of the fact that fraud must be established by clear and convincing evidence, it well may be that when the facts are more fully developed, a court will conclude, as a matter of law, that the reliance here was not reasonable.[11] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

In the amended complaint, however, the Parkers have alleged a cause of action in fraud against the appellees (except for Bond),[12] as to the following alleged misrepresentations by Galeone: (1) Galeone and Columbia would protect the Parkers' interest, as well as Columbia's, throughout the construction of the house, while in fact Galeone had no intention of protecting the Parkers' interest unless it coincided with Columbia's; (2) construction draws would only be

---

Parkers, perhaps makes the allegation as to the draws unlikely, but does not expressly contradict it. The third contract provision similarly does not directly contradict the alleged oral promise to find a builder at the same price if Paleologos should default.

11. For example, Columbia, in an affidavit submitted by Galeone in the foreclosure proceedings, asserts that the Parkers knew that Evangelos agreed to build their house at a price far below normal hoping to realize significant economies of scale by building seven houses at once, but they also knew of the risks attendant to this scheme. If this statement is undisputed or demonstrated to be true, it would substantially undermine the Parkers' claim that they reasonably relied on Galeone's representation that, in the event of Paleologos' default, Columbia would hire another builder to complete the project at the contracted price.

12. There seems to be no basis for any claim against Bond who is not alleged to have ever met or spoken to the Parkers or to have any involvement with administration of the Parkers' loan.

issued after Columbia had obtained inspections to insure that work had been done in accordance with the draw schedule, while in fact Columbia inter··· ᵈ to advance funds ahead of the draw schedule and regaidless of draw inspections if requested by Paleologos; and (3) in the event of default by Paleologos and Evangelos, Columbia "would find or recommend another builder and would see that the house was completed within budget" while, in fact, Columbia intended to provide no such protection to the Parkers.

(iii)

 The Parkers' breach of contract claim alleges a violation of the express terms of the contract and of an implied duty of good faith. First, the Parkers assert that Columbia breached the express terms of Article 9, Section 9.1 of the loan agreement by disbursing draws when the loan was out of balance. Section 9.1 provides:

*Lender's Duty to Disburse*—Lender agrees, upon Borrower's compliance with all conditions precedent to the Opening of the Loan, and provided the Loan is in balance, to open the Loan hereunder and to continue to disburse the same so long as the Loan remains in balance and Borrowers have complied with all conditions precedent from time to time and is not in default hereunder.

This section does not prohibit Columbia from disbursing draws if the loan is out of balance; it merely provides that Columbia is *not obligated* to disburse draws when the loan is out of balance. By its terms, Section 9.1 is for Columbia's protection, not the Parkers'. Columbia was not contractually obligated to make sure that the Parkers' loan remained in balance. Rather, it was the Parkers who were obligated to maintain the loan in balance. Indeed, to the extent that the loan became out of balance, the Parkers were expressly obligated, under Section 8.1 of the loan agreement, to invest additional funds in the project to rectify the problem.

 The Parkers also allege that Columbia breached an implied duty of good faith and fair dealing "by advanc-

ing the builder funds for work not done, failing to disclose to the Parkers the true financial condition of the project and by actively misleading" the Parkers as to its condition. Under Maryland law, a duty of good faith and fair dealing is an implied term in certain contracts, *see Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 535–36, 200 A.2d 166, 174–175 (1964), but this duty simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract. *See Automatic Laundry Service v. Demas*, 216 Md. 544, 141 A.2d 497 (1958). Thus, the duty of good faith merely obligates a lender to exercise good faith in performing its contractual obligations; it does not obligate a lender to take affirmative actions that the lender is clearly not required to take under its loan documents. *See Centennial Industries, Inc. v. Union Trust Company of Maryland*, 75 Md.App. 202, 540 A.2d 1169, *cert. denied*, 313 Md. 505, 545 A.2d 1343 (1988). *See also Taggart & Taggart Seed, Inc. v. First Tennessee Bank*, 684 F.Supp. 230 (E.D.Ark.1988), *aff'd*, 881 F.2d 1080 (8th Cir.1989); *Badgett v. Security State Bank*, 116 Wash.2d 563, 807 P.2d 356 (1991); *Creeger Brick & Bldg. Supply v. Mid–State Bank & Trust Co.*, 385 Pa.Super. 30, 560 A.2d 151 (1989); *Coles Department Store v. First Bank*, 240 Mont. 226, 783 P.2d 932 (1989); *Thormahlen v. Citizens Savings & Loan*, 73 Or.App. 230, 698 P.2d 512, *rev. denied*, 299 Or. 443, 702 P.2d 1111 (1985).

Here, the Parkers have not alleged that Columbia prevented them from performing any of their contractual obligations under the loan agreement. The Parkers have merely alleged that Columbia failed to take certain actions that Columbia was clearly *not* required to take under the loan agreement. In essence, the Parkers contend that Columbia should have protected their interests by monitoring Evangelos's work to make sure that the loan was in balance and that Evangelos was performing the work covered by each draw. Columbia, however, as discussed above, had no obligation under the loan agreement to make sure that the loan was in balance. Similarly, Columbia had no obligation

under the loan agreement to inspect Evangelos's work to make sure that the work covered by each draw had been performed. Rather, Section 12.10 of the loan agreement expressly provided that any actions taken by Columbia to inspect or monitor the builder's work was exclusively for Columbia's benefit. Accordingly, Columbia had no contractual obligation to do any of the things that the Parkers alleged it should have done, and so the court below did not err in dismissing the Parkers' breach of contract claim.

(iv)

 In order to state a cause of action as to all of their remaining claims—fraudulent concealment, negligent misrepresentation, negligence, and breach of fiduciary duty—the Parkers must demonstrate a duty owed to them by Columbia. *See Impala Platinum v. Impala Sales, Inc.,* 283 Md. 296, 323, 389 A.2d 887, 903 (1978) (ordinarily, nondisclosure does not constitute fraud unless there exists a *duty* of disclosure); *Martens Chevrolet v. Seney, supra,* 292 Md. at 337, 439 A.2d at 539 (in order to state a claim for negligent misrepresentation, plaintiff must allege that defendant, who had a *duty* of care to plaintiff, negligently asserted a false statement); *Jacques v. First Nat'l Bank,* 307 Md. 527, 531, 515 A.2d 756, 758 (1986) (in order to state a claim for negligence, plaintiff must allege a *duty* owed by the defendant to plaintiff); Restatement (Second) of Torts § 874, comment b (1979) (in order to state a cause of action for breach of fiduciary duty, plaintiff must allege a breach of fiduciary *duty* to him causing damages).

In pressing these claims, the Parkers heavily rely upon *Jacques v. First Nat'l Bank, supra.* There, the Court of Appeals held that a bank, which contracted for a specified fee to process a residential loan application, was required to "use reasonable care" in doing so. *Id.* at 540, 515 A.2d at 762. Thus, as Judge McAuliffe carefully explained for the Court in *Jacques,* the basis for the duty of care was an express, albeit oral, contract. As we have held, *supra,* here Columbia did not breach its contract with the Parkers.

Accordingly, unlike *Jacques*, no contractual promise provides a predicate for a tort duty of reasonable care here.

 Moreover, recently in *Yousef v. Trustbank Sav., F.S.B.*, 81 Md.App. 527, 568 A.2d 1134 (1990), we reiterated a long-standing principle of Maryland law that the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between a debtor and a creditor, and is not fiduciary in nature. *Id.* at 536, 568 A.2d at 1138 (*citing University Nat'l Bank v. Wolfe*, 279 Md. 512, 514, 369 A.2d 570, 571–572 (1977); *Suburban Trust Co. v. Waller*, 44 Md.App. 335, 339, 408 A.2d 758, 761–762 (1979); Annotation, *Existence of Fiduciary Relationship Between Bank and Depositor Or Customer So As To Impose Special Duty of Disclosure Upon Bank*, 70 A.L.R.3rd 1344, 1356–57 (1976 & Supp.1989)). *See also Gillen v. Maryland Nat'l Bank*, 274 Md. 96, 333 A.2d 329 (1975). In *Yousef*, disgruntled commercial borrowers appealed an order dismissing their claims in contract, negligence and civil conspiracy against a lender; we affirmed the order. The borrowers, who were shopping center tenants seeking to purchase the shopping center, asserted that a clause within the loan agreement with the defendant bank, which provided that the borrowers would provide the lender with documentation that 85% of the shopping center had been leased, imposed a duty on the lender to review the shopping center leases for validity and enforceability. When it turned out that less than 50% of the space had been leased, the borrowers alleged that the lender was negligent in its failure to inspect the leases. Such an interpretation of the lender's obligations, we said, was, "to put it mildly, misplaced." *Yousef, supra*, 81 Md.App. at 534, 568 A.2d at 1137. Thus, we refused to permit the borrower in *Yousef* "to attach to the appellee the assumption of any greater duty than that specified in [the contract between the parties]". *Id.* at 537, 568 A.2d at 1138–1139.

 If the Parkers' situation were clearly analogous to that of the borrowers in *Yousef*—that is, if the Parkers

were business people with more experience dealing with banks and if they were relying on a contractual provision designed for the exclusive benefit of the lender as the sole source of the affirmative duty they allege—then we would, without further elaboration, affirm the circuit court's order to dismiss. There are, however, sufficient facts alleged here, which distinguish the Parkers from the borrowers in *Yousef,* to prompt us to evaluate the merits of the Parkers' assertion that "special circumstances" exist here such that Columbia owed them a fiduciary duty over and above any contractual obligations.

Courts have been exceedingly reluctant to find special circumstances sufficient to transform an ordinary contractual relationship between a bank and its customer into a fiduciary relationship or to impose any duties on the bank not found in the loan agreement. *See, e.g., Centerre Bank of Kansas City v. Distributors,* 705 S.W.2d 42, 53 (Mo.App. 1985) (because there is "no confidential or fiduciary relationship between a bank and a customer borrowing funds," the bank has no duty to disclose it has classified a loan as "troubled"); *Thormahlen v. Citizens Savings and Loan, supra,* 698 P.2d at 517 (no case "holds that a construction lender has, independent of contract, a common-law duty to limit disbursements to the borrower to an amount equal to the percentage of completion of the work") and numerous cases cited therein. Some cases do state that such special circumstances "may" exist where "the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and relying on the bank to counsel and inform him." *Klein v. First Edina Nat'l Bank,* 293 Minn. 418, 196 N.W.2d 619, 623 (1972). *See also Bank of Red Bay v. King,* 482 So.2d 274, 285 (Ala.1985); *Denison State Bank v. Maderia,* 230 Kan. 684, 640 P.2d 1235, 1243 (1982). Yet even in those cases, courts generally have refused to hold the bank liable to its customer, reasoning that a borrower cannot "abandon all caution and responsibility for his own protection and unilaterally impose a fiduciary relationship on another without a *conscious as-*

*sumption* of such duties by the one sought to be held to be liable as a fiduciary." *Maderia,* 640 P.2d at 1243–44 (emphasis added). *See also King, supra,* 482 So.2d at 285. Moreover, precisely this conclusion has been reached on facts far more sympathetic than those at hand. *See Klein, supra,* 196 N.W.2d at 623.

In *Tokarz v. Frontier Federal Sav. & Loan Ass'n,* 33 Wash.App. 456, 656 P.2d 1089 (1982), a case relied on by both parties, the Court of Appeals of Washington, after reviewing the case law, and recognizing the general rule, enunciated in *Yousef,* that the relationship between a bank and its customer does not ordinarily impose a fiduciary duty on the bank, identified four "special circumstances" which might nonetheless "dictate" such a duty. *Id.* 656 P.2d at 1092–94. The analysis of the *Tokarz* court is compelling here, not only because it attempts to synthesize the abundant caselaw in the field and set forth an identifiable test, but also, and just as significantly, because the facts involved there have, as the Parkers acknowledge, "many similarities" to those at hand.

In *Tokarz,* as here, the plaintiffs were borrowers who contracted for a residential construction loan with their bank. In *Tokarz,* as here, the bank learned, shortly after agreeing to make the construction loan to the borrowers, that the borrowers' builder was having "evident" financial problems but did not disclose those problems to the borrowers. Finally, in *Tokarz,* as here, the borrowers ultimately sued the bank alleging it breached its fiduciary duty and fraudulently failed to disclose the builder's financial condition to them. The trial court granted summary judgment to the bank in *Tokarz.* The Washington appellate court affirmed, holding that it found "none of the special circumstances which may impose a fiduciary duty." *Id.* 656 P.2d at 1094. Specifically, the *Tokarz* court found "no allegation or evidence" that the lender "(1) took on any extra services on behalf of [the borrowers] other than furnishing the money for construction of a home; (2) received any greater economic benefit from the transaction other than the nor-

mal mortgage; (3) exercised extensive control over the construction; or (4) was asked by [the borrowers] if there were any lien actions pending." *Id.* The Parkers do not assert that *Tokarz* is wrongly decided or inapplicable here. Rather, they embrace it and claim that such "special circumstances" are alleged here. That claim is belied by the authorities relied on in *Tokarz*, the facts there, and the similarity of the *Tokarz* facts to those alleged here.

First, *Tokarz* makes clear that the "extra services" triggering a lender's duty are, contrary to the Parkers' argument, something more than the normal investigations, evaluations, and inspections that a prudent lender makes as a part of any construction loan since those normal services were presumably provided by the defendant bank in *Tokarz* without it incurring any liability to its borrower. Rather, the *Tokarz* court pointed to *Hutson v. Wenatchee Fed. Savings & Loan Ass'n*, 22 Wash.App. 91, 588 P.2d 1192 (1978) and *Burien Motors, Inc. v. Balch*, 9 Wash.App. 573, 513 P.2d 582 (1973) as cases in which the defendant had performed "extra services" for the plaintiffs. In *Hutson*, the defendant savings & loan institution undertook to provide its customers with credit life insurance and so was held to have a duty to disclose fully the nature of the insurance the customers were purchasing, 22 Wash.App. at 104, 588 P.2d at 1192; in *Burien*, a real estate broker who undertook to draft lease assignment papers was held to have a duty to disclose the adverse zoning law status of the real estate or the broker's ignorance of this status. 513 P.2d at 586. *See also Walters v. First Nat'l Bank of Newark*, 69 Ohio St.2d 677, 433 N.E.2d 608 (1982) (bank which undertook to procure credit life insurance for borrower held to have a duty of care in procuring insurance); *Stewart v. Phoenix Nat'l Bank*, 49 Ariz. 34, 44, 64 P.2d 101, 106 (1937) (bank which acted as financial advisor to borrower for 23 years held to have duty to him).

Thus, all four cases cited above involve truly extra, out of the ordinary services and so are very different from *Tokarz* and the case at hand where all of the services performed by

the lender were services normally provided by a bank for its customer. Such normal services, even if performed over a far more extended period of time than that involved here, do not constitute "extra services" creating a duty of care in the lender. *See, e.g., Klein v. First Edina Nat'l Bank, supra* (plaintiff, a widow, who had been a bank customer for 20 years and for whom bank had performed a number of services, held not to state a prima facie case of duty of bank to disclose to her the financial condition of person for whom she posted security).

■ Secondly, as in *Tokarz*, no economic benefit was received by the bank here from the loan other than the normal mortgage. Again, *Tokarz* itself makes clear that the fact that a bank is lending, or wants to lend, money to the plaintiffs' builder does not mean that it has received *from the plaintiff's loan* an economic benefit, other than the mortgage itself.[13] Rather, it is only when the bank will receive a direct economic benefit it would not otherwise have had, through the fraud of one of its depositors and/or at the expense of one of its clients, that it has been held to have a duty to disclose the fraud to its customer. *See Merrill Lynch v. First Nat'l Bank of Little Rock,* 774 F.2d 909, 914 (8th Cir.1985) ("a bank may [not] act unilaterally to shift" a loss "onto a depositor who is relying on the bank's policy of giving prompt notice of checks to be charged back to its account"); *Barnett Bank of West Florida v. Hooper,* 498 So.2d 923, 925 (Fla.1986) (bank cannot recover on note

---

13. In *Tokarz,* the bank had a relationship with the builder prior to that with the plaintiff borrowers. 656 P.2d at 1091. Thus, the bank in *Tokarz* had a pre-existing, presumably lucrative, relationship with the builder, which would have given it far more economic incentive to make the loan in question than Columbia's alleged hopes of attracting business gave it here. Moreover, the bank in *Tokarz* had "made loans for five prior homes built by" the builder and decided to "discontinue lending money" to the builder because of the builder's economic problems less than a month after making advances to the builder on the construction loan. *Id.* 656 P.2d at 1091–92. Here, Columbia continued to permit Paleologos to draw on its $250,000 line of credit for three months after it advanced the last draw on the construction loan.

to one of its bankrupt depositors when it knew, and did not disclose, depositor was defrauding customer); *Richfield Bank & Trust Co. v. Sjogren*, 309 Minn. 362, 244 N.W.2d 648 (1976) (same).

Thirdly, again contrary to the Parkers' assertions, they do not allege that the bank exercised the "extensive control over the construction" identified by the *Tokarz* court as possibly creating a special duty to the borrower. *See Bradler v. Craig*, 79 Cal.Rptr. 401, 407, 274 Cal.App.2d. 466 (1969) ("Approval of plans and specifications, and periodic inspection of houses during construction is normal procedure for any construction money lender" and triggers no special duty to the borrower). Thus, although the Parkers assert that Columbia received numerous calls from contractors and suppliers inquiring about payment, and designated one of its employees to "field" those calls and make representations to callers, they do not allege that, while they were making payments on their mortgage, Columbia ever disbursed funds to anyone except them or took charge of supervision of construction. *Compare Prudential Ins. Co. v. Executive Estates*, 174 Ind.App. 674, 369 N.E.2d 1117, 1123 (1977); *Speights v. Ark. Savings & Loan Ass'n*, 239 Ark. 587, 590, 393 S.W.2d 228, 230 (1965).

Nor is there any allegation of the last special circumstance identified by the *Tokarz* court, that the borrowers inquired of the bank as to whether there were "any lien actions pending" and were given false information. In *Tokarz*, the bank knew that there were lien actions pending against the builders. The court held, however, that in the absence of the borrower's specific inquiry, the bank had no duty to disclose the liens. Here, there is *no* allegation that the Parkers asked Columbia about liens and received an untruthful answer. Indeed, the very paragraphs of the complaint upon which the Parkers rely for their argument to the contrary indicate that the Parkers knew about the

liens before Columbia.[14]

In sum, in cases like the one at hand where there are none of these special circumstances and no contractual basis for a special duty of care is alleged, a lender owes no duty of care to its borrower.[15] Accordingly, the Parkers have not alleged sufficient facts to establish that Columbia owes them a duty and so the circuit court was correct in dismissing their fraudulent concealment, negligent misrepresentation, negligence and breach of fiduciary duty claims.

### (v)

■ Finally, we turn to the question of whether the circuit court erred in overruling the Parkers' exceptions to the foreclosure sale. The Parkers never posted a bond pursuant to Maryland Rule 8–423 (1991 Repl.Vol.) in order to stay the enforcement of this civil judgment against them. Accordingly, Columbia was free to resell to a bona fide purchaser the property which it had bought back at the foreclosure sale. We are informed that during the pendancy of the appeal in this case, Columbia has sold the property to a bona fide purchaser. The right of a purchaser to receive property acquired at judicial sale cannot be affected by the reversal of an order ratifying the sale where a bond has not been filed, except in those cases where there is evident collusion between the purchaser and the trustee. *See Onderdonk v. Onderdonk,* 21 Md.App. 621, 624, 320 A.2d 585, 586–587 (1974). *See also Leisure Campground & Country Club Ltd. Partnership v. Leisure Estates,* 280 Md. 220, 223, 372 A.2d 595, 598 (1977). This is not alleged by the Parkers here. Accordingly, appeal from the order overruling the exceptions to the foreclosure sale is now

---

**14.** The Bank's statement that the value was "in the ground" and that there was nothing to worry about was, we have held, not a misrepresentation of fact, but "puffing" or opinion. *See, supra,* part ii.

**15.** In view of this holding, we note, but need not reach, Columbia's argument that Md.Fin.Inst.Code Ann. § 1–302(1) (1989 Repl Vol.), by prohibiting a bank from disclosing the "financial record" of a customer, makes the bank's alleged duty of disclosure impossible.

moot. *See Creative Development Corp. v. Bond,* 34 Md. App. 279, 284–85, 367 A.2d 566, 569 (1976).

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.

COSTS TO BE PAID 80% BY APPELLANTS AND 20% BY APPELLEES.