**SILVER HILL STATION LIMITED PARTNERSHIP, Plaintiff,**

v.

**HSA/WEXFORD BANCGROUP, LLC, Defendant.**

**No. Civ. PJM 99–3439.**

United States District Court, D. Maryland.

July 30, 2001.

As Amended Aug. 21, 2001.

Brian C. Parker, Mark Menton Dumier, Parker, Dumler & Kiely LLP, Baltimore, MD, for plaintiff.

Roger W. Titus, David R. Warner, Venable, Baetjer & Howard, LLP, Rockville, MD, for defendant.

## OPINION

MESSITTE, District Judge.

Silver Hill Station Limited Partnership (Siena)[1] has sued HSA/Wexford Bancgroup, LLC (Wexford) for negligence and negligent misrepresentation in connection with a failed loan application Siena submitted to Wexford. Wexford has filed a Motion for Summary Judgment. Having considered the parties' pleadings, the Court will GRANT Wexford's Motion.

### I.

A) Siena owns the Silver Hill Station Shopping Center in Suitland, Maryland. As of the time of the transaction that gave rise to this lawsuit, it had developed between 45 and 50 commercial real estate projects and was managing over one million square feet of commercial property. Wexford is a mortgage banking concern specializing in funding first mortgage loans for income-producing commercial real estate.

Beginning in the fall of 1997, Siena sought a new loan to refinance the mortgage loan on the shopping center which had been placed at the time of original construction and which was due to expire in March 2001. Kenneth Hankin, Siena's President, who had been personally active in Siena's multiple financings and refinancings over several years, hired Stephen Rozga of H.G. Smithy Company, a commercial mortgage broker, to act as the "principal point of contact" with potential lenders. Rozga had worked in the commercial mortgage business for some 17 years.[2]

Siena was looking for a non-recourse loan of approximately $3.2 million dollars with a repayment term of 10 to 20 years. Hankin and Rozga decided to seek refinancing through what is known as a conduit or CMBS lender[3] because they believed the property presented "more degree of risk" than might be acceptable to other types of lenders.

In order to obtain quotes of the amounts that lenders might be willing to lend taking only the shopping center as security for the loan, Rozga prepared and distributed a "preliminary mortgage loan package." In early November 1997 he sent out Siena's loan packages to five prospective conduit lenders; by July 1998 he sent a second set of requests to seven more such lenders. Although the record does not

---

1. Siena Corporation is the general partner of the Silver Hill Station Limited Partnership. Notwithstanding the nominal status of Silver Hill as Plaintiff, the parties in their pleadings refer to Siena as Plaintiff and the Court will do likewise.

2. The Court notes that Hankin and Rozga have been designated by Siena as its experts in this litigation.

3. CMBS stands for "collateralized mortgage backed securities." A conduit lender closes a mortgage loan, then immediately resells it to another company which packages the loan together with other such loans and resells the packaged loans as security for a bond which is publicly traded.

contain the quotes from all of Siena's prospects, as of August 1998 Siena had received a range of quotes between $2.85 to $3.15 million. In late September-early October 1998, Rozga sent out a third round of "requests," in response to which he received quotes ranging from $2.675 million to $3.1 million.

Approximately three months later, in January 1999, Rozga was contacted by Mark Tucker, a mortgage broker working for Wexford. Tucker, who had learned of Siena's quest for a loan, inquired about the possibility of Wexford providing it. Rozga followed up promptly, sending Tucker the same preliminary loan package that had been given to other prospective lenders. Not long after, Tucker, on behalf of Wexford, submitted a blank mortgage loan application to Rozga containing a "preliminary loan amount" of $2.959 million.

The loan application contained the following proviso:

> Applicant acknowledges and agrees that the foregoing terms are preliminary and, if lender accepts this Application and thereafter issues to Applicant a Loan Commitment, the terms and conditions of the Loan set forth therein may vary from those contained in this Application due to underwriting due diligence, loan committee requirements and/or market interest rate changes.

The application also contained this proviso:

> Applicant acknowledges that Lender will require satisfactory third party professional reports to be delivered to Lender prior to final consideration of the loan.

And this proviso:

> A $10,000 Expense Deposit is due with the execution and delivery of this Application to Lender. The deposit will be used to pay third party reporting costs, legal costs and third party accounting or

consulting costs (if applicable). This amount is non-refundable and is earned by the Lender as an underwriting fee if the borrower does not accept a commitment that is in substantial compliance with the material terms on this Application. The Expense Deposit shall be refunded only to the extent that the costs and expenses incurred by the Lender, or on behalf of the Lender by any third party, in connection with analysis or processing of this Application, are less than the Expense Deposit and no commitment is issued in substantial conformance to this Application. If the Borrower applies or requests a loan secured by the property as stated in this Application from any other lender while still under application with the Lender, then the Expense Deposit shall be earned by the Lender as an underwriting fee. In such event, Applicant will still be responsible for all of Lender's costs and expenses.

And finally this proviso:

> This is a Loan Application, not a Loan Commitment. Applicant acknowledges and agrees that nothing contained herein, and no prior or subsequent communication from Lender to Applicant, whether written or verbal, shall be deemed or construed to constitute or imply a commitment or offer by Lender to make the Loan, and no such commitment or offer shall exist unless and until Lender expressly executes a Loan Commitment or offer in writing and delivers such Loan Commitment or offer to the Borrower.

On February 18, 1999, the application, signed by Siena's President Hankin, was submitted to Wexford, along with a $2,500 application fee and a $10,000 expense deposit.

Siena maintains that from the beginning Tucker represented that it would qualify for financing in the amount of $2.959 mil-

lion. It says further that the necessary appraisal and engineering reports were substantially completed by the end of March 1999, and that at that time Tucker advised Rozga that a loan commitment letter would be issued within a few days. Although that did not happen and several weeks went by, in early May Tucker allegedly told Siena that its application had actually been approved and that a formal commitment letter would be delivered. In fact the loan had not been approved and no firm commitment letter was forthcoming.

Instead, says Siena, on May 21, 1999 Wexford faxed to it a "preliminary commitment letter" that was contingent on several matters, including approval of the loan by Wexford's loan committee.

Siena contends that the preliminary commitment letter was inconsistent with the loan application in several respects, including the manner in which the interest rate on the loan was to be calculated, the amortization rate of the loan, the party who was to have liability for exceptions to the non-recourse provisions of the loan, and the inclusion of property insurance premiums as part of the required escrow.

Rozga states that he repeatedly attempted to contact Wexford to discuss the preliminary commitment letter and the proposed loan, but that Wexford refused to return his calls or otherwise communicate either with him or his client. For that reason, on July 28, 1999, Siena had its attorney write to Wexford, stressing that Wexford had a legal obligation to reasonably process Siena's loan application and suggesting that if Wexford would forward to him a list of the closing items needed from Siena, Siena was prepared to proceed with the transaction.

When Wexford had still not issued a firm commitment by late September, 1999, Siena commenced this litigation.[4]

B) Wexford's version of the progression of the transaction differs markedly from Siena's.

While not necessarily disputing that Tucker may have made certain representations regarding Siena's prospects for the loan, Wexford emphasizes that it had a number of underwriting concerns that Siena never satisfactorily addressed, an especially important one of which related to the environmental status of the shopping center site. Thus, before Siena ever submitted its application to Wexford, Wexford had furnished it with guidelines for third party environmental reports which provided that:

> Any concern for a potential hazard should be presented with clear & concise language, whereby the issue is either closed or can be managed by a methodology or, with a definitive corrective action, will result in a closed or controllable issue.

The guidelines provided further that underground storage tank (UST) "sites should be discussed specifically with regard to why they do/do not pose a risk to the subject property."

To prepare these environmental reports, Wexford engaged Hillis–Carnes Engineering Associates, Inc., a firm Siena had worked with before and which it had recommended to Wexford. Hillis–Carnes was tasked with preparing what was known as a Phase I environmental site assessment to determine the shopping center's proximity to known or potential contaminant sources. Its final report bore the date of April 20, 1999.

---

4. Suit was originally filed in the Circuit Court for Prince George's County on September 29, 1999, and was subsequently removed to this Court.

The report noted no visual evidence of underground storage tanks, but referred to a 1988 assessment that another engineering firm had prepared for the site, which identified two USTs, one a 5,000 gallon fuel oil tank and the second a 1,000 gallon gasoline tank. The 1988 assessment reported that the 5,000 gallon tank had been removed and that soil and ground water tests had been performed as to that tank, but stated further that no tank could be found at the supposed location of the 1,000 gallon tank and therefore proceeded on the assumption that the second tank had also been removed. Hillis–Carnes acknowledged that no closure letter had been received from the Maryland Department of the Environment (MDE) for the two USTs in 1988, but based on the laboratory results of the soil and ground water testing conducted by the engineering firm in 1988 and based on its own visual inspections of the soil in 1999, Hillis–Carnes advised Wexford that it did "not consider the former on-site tank(s) to be an environmental concern."

Wexford, however, did consider the tanks to be a concern. On May 12, 1999, its underwriter, Patty Davis, faxed a letter to Kimberly Minetola of Hillis–Carnes, asking for "additional narrative and documentation to support (per the state and federal EPA) that a Phase II [engineering report] is not required on the prior removal of the USTs in 1988/1989. As there was no closure letter obtained, the remediation was performed per current guidelines. From our standpoint, this issue is unresolved...."

On May 20, Hillis–Carnes wrote back to Wexford, advising that it had sent a letter to the MDE relative to obtaining a notice of compliance, but had been told that it would take at least two months to process the request, assuming the MDE decided to grant a notice of compliance at all.

Although the issue of the USTs remained in abeyance for the next two months, it did not disappear and on August 18, Davis sent a fax to Hankin referring, among other things, to "the issue concerning UST removal."

So the matter reposed until September 1, 1999, when the MDE sent a response to Hillis–Carnes's inquiry relative to the notice of compliance. The response, authored by John J. Smiechowski, Regional Head of the Compliance/Remediation Division of the MDE Oil Control Program, was not encouraging. "The Oil Control Program," he wrote,

> can only comment on our review of the report and not on current site conditions. If a formal *Notice of Compliance* is required, additional site investigation will be needed, such as direct-push or soil boring/ground water-sampling program. Based on contamination levels found in the six soil borings performed around the 5,000–gallon fuel oil tank and two monitoring wells installed at least 50 feet or more away from this tank, we do not require additional remedial activities. However, since soil or water samples were not collected from the area identified as the location of the 1,000–gallon gasoline tank, we cannot determine if significant contamination exists (emphasis in original).

Siena never took steps to bring the matter to resolution, electing instead—some four weeks later—to file this lawsuit.

The parties, however, agree that had it chosen to do so, Siena could have arranged for appropriate soil testing as part of the Phase II assessment at a cost of between $3,000 and $4,000 and that such testing could have been accomplished within approximately a 10 day period.

Siena contends that Wexford's intransigence on the UST issue was unreasonable

and that most lenders in Wexford's position would have gone forward with a loan commitment notwithstanding the status of the USTs. Accordingly, it claims that Wexford acted negligently in processing its loan application and that Tucker, as Wexford's agent, made negligent misrepresentations regarding the status of the loan.

As a result of Wexford's actions, Siena contends it was forced to unnecessarily incur out-of-pocket expenses, including the $12,500 paid to Wexford in up-front fees plus additional fees paid for title work and a survey. Further, as a result of the increase in interest rates that occurred during the period that Wexford purportedly delayed in processing the loan application, Siena says it was unable to qualify for a new loan to refinance the shopping center loan and was eventually forced to pay a substantially higher interest rate on a substitute loan.

Wexford contends that it was fully justified in refusing to issue a final loan commitment so long as the environmental issue, among others, remained unresolved.

## II.

Summary judgment is appropriate if no material facts are disputed and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Whether a cause of action exists may be decided on a motion for summary judgment as well as on a motion to dismiss under Fed.R.Civ.P. 12(b)(6). Similarly, when the facts controlling the application of a rule of law are undisputed, the application raises a question of law for the court which the court may decide on a motion for summary judgment. *See e.g. Trevino v. Yamaha Motor Corp.,* 882 F.2d 182, 184 (5th Cir.1989).

## III.

A) Causes of action based on either negligence or negligent misrepresentation require, first and foremost, that the party sued owed a duty in tort to the party bringing the suit. *Jacques v. First Nat'l Bank of Maryland,* 307 Md. 527, 515 A.2d 756 (1986) (negligence); *Parker v. Columbia Bank,* 91 Md.App. 346, 604 A.2d 521 (1992) (negligent misrepresentation). The parties in the present suit disagree over the extent to which a bank or other lender owes a prospective borrower a duty in tort, specifically, the extent to which a lender owes a duty of care in processing a prospective borrower's loan application or a fiduciary duty to the borrower to refrain from making careless misstatements regarding the status of the loan application.

Siena cites the seminal case of *Jacques, supra,* for the proposition that a lender owes its customer a duty of reasonable care in the processing of a loan application whenever contractual privity exists between the lender and the customer, and that such privity is established whenever the customer pays the bank a processing fee. In contrast, Wexford argues that, under *Jacques,* contractual privity by itself is insufficient, that additional factors such as unusual or extraordinary risk, particular vulnerability or dependence by the customer, or public policy must be present before a tort duty will be imposed. The Court recognizes that language in *Jacques* points in both directions.

In *Jacques,* the borrowers sought a $112,000 bank loan in connection with a contract to purchase a residence. 307 Md. at 529, 515 A.2d at 756. Their liability under the sales contract was contingent upon securing bank financing, but they also had agreed, *inter alia,* to increase the downpayment on the residence to whatever amount might be necessary to qualify for a mortgage loan. *Id.* at 529, 515 A.2d

at 757. Once the sales contract and a fee of $144 for an appraisal and credit report were submitted to the bank, it specifically agreed to lock-in an interest rate of 11 ⅞ percent for 90 days from the date the application was received. *Id.* In the course of processing the application, however, the bank advised the borrowers that they only qualified for a loan of $74,000, and later, claiming error in its determination of eligibility, advised them that they only qualified for a $41,400 loan. *Id.* at 530, 515 A.2d at 757. The borrowers promptly sought financing from another lender which, while available, was only available at a rate of interest two points higher than what the first bank had offered. The borrowers therefore decided to forego the second loan and took the first bank's loan of $41,400, covering the increased downpayment on the purchase price of the residence with personal funds. *Id.* They then sued the first bank for, among other things, negligence in processing their loan application. *Id.* After prevailing in the trial court and being reversed by the Maryland Court of Special Appeals, the borrowers convinced the Maryland Court of Appeals to grant *certiorari* "to determine whether a bank does owe a duty to its customer *under the circumstances presented by [the] case.*" *Jacques,* 307 Md. at 531, 515 A.2d at 758 (emphasis added). In an opinion authored by Judge McAuliffe, the Court of Appeals concluded that the bank did owe such a duty.

Siena points to the following language in support of its reading of the court's holding:

> In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only,

courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent.

*Jacques,* 307 Md. at 534–35, 515 A.2d at 759–60 (footnotes omitted).

Siena continues:

> The *Jacques* court found that the bank had expressly promised the borrowers both to process their loan application and to lock in a fixed interest rate for 90 days. *Id.* at 537, 515 A.2d at 761. It also found the $144 paid by the borrowers for the appraisal and credit report to be valid consideration for the promise; that the bank stood to gain a business advantage inasmuch as making a loan would bring it a profit; and that, although the borrowers did not covenant that they would refrain from simultaneously seeking loans from other lenders, the practicalities of the home loan market and the expense of simultaneously seeking alternative financing effectively took the borrowers out of the market, if only temporarily. *Id.* at 537–38, 515 A.2d at 761.

Siena finds precise parallels between these aspects of *Jacques* and its own situation. By accepting Wexford's quote for a loan, Siena says, it gave up its right to pursue financing with other lenders. It also paid a $2,500 application fee and a $10,000 expense deposit. Payment of these fees, Siena argues, is more than sufficient to imply a promise by Wexford to process the application and to do so with reasonable care, or "else the promise and the fee payment are meaningless." *High v. McLean Fin. Corp.,* 659 F.Supp. 1561, 1570 (D.D.C.1987) (applying D.C. law).

Wexford gives *Jacques* a very different interpretation. True, it says, the Maryland Court of Appeals declared that the "intimate nexus" necessary for the imposi-

tion of a tort duty "is satisfied by contractual privity or its equivalent." 307 Md. at 534–35, 515 A.2d at 759–60. But just two paragraphs above that statement the court also stated, "[n]or does a duty assumed or implied in contract by that fact alone become a tort duty." 307 Md. at 534, 515 A.2d at 759. Indeed, after finding the existence of a contract between the borrowers and lender, the court spent two additional pages of analysis in determining whether a tort duty should be imposed. In the words of the court:

> Having therefore found that a contract was created between the parties, and that this contract included an implied promise to use reasonable care, we turn to the final consideration of whether a concomitant tort duty should be recognized under these circumstances.

307 Md. at 540, 515 A.2d at 762.

The court then went on to find, under the circumstances of the case, the existence of several additional factors weighing in favor of imposing a tort duty:

> [T]he rather extraordinary financing provisions contained in the real estate sales contract, and thereby integrated into the loan application, left the Jacques particularly vulnerable and dependent upon the Bank's exercise of due care.
>
> \*     \*     \*     \*     \*     \*
>
> [T]he Bank had knowledge that the Jacques would be legally obligated to

either proceed to settlement with the loan determined by the Bank or forfeit their deposit of $10,000.00 and lose any benefit of their bargain.

\*     \*     \*     \*     \*     \*

> An additional factor relevant to the determination of whether to recognize the existence of a tort duty is the nature of the business of the party upon whom the burden is sought to be imposed.

307 Md. at 540–41, 515 A.2d at 762–63.

From this, Wexford argues, it should be clear that contractual privity does not automatically trigger a tort duty on the part of a lender. Indeed, it says, if *Jacques* stands for the proposition that a contractual relationship between the borrower and lender alone suffices to establish an intimate nexus and an attendant tort duty, then none of the foregoing discussion by the court is relevant and its discussion of duty is mere surplusage.

The Court considers which of these views of *Jacques* is more plausible.

Both Siena and Wexford have invited the Court's attention to cases that followed in the wake of *Jacques*. Siena relies principally on the *High* case, *supra*, applying District of Columbia law, which unquestionably interpreted *Jacques* as Siena does. Wexford, on the other hand, submits that no reported Maryland case—state or federal—has ever held a lender liable for the negligent processing of a loan application.[5]

---

**5.** *See, e.g., Martens v. First Nat'l Bank of Maryland,* 1988 WL 252577, at \*2 (D.Md.1988) (granting motion for summary judgment on borrower's negligence claim against lender), *aff'd,* 875 F.2d 315 (4th Cir.1989); *G & M Oil Co. v. Glenfed Fin. Corp.,* 782 F.Supp. 1078 (D.Md.1989) (same); *Yousef v. Trustbank Sav., F.S.B.,* 81 Md.App. 527, 568 A.2d 1134 (1990) (upholding motion to dismiss borrower's negligence claim under Maryland's equivalent of Rule 12(b)(6)); *G & M Oil Co. v. Glenfed Fin.*

*Corp.,* 782 F.Supp. 1085 (D.Md.1991) (granting motion for summary judgment on borrower's negligent misrepresentation claim against lender), *aff'd,* 947 F.2d 940 (4th Cir.1991); *Parker v. Columbia Bank,* 91 Md.App. 346, 604 A.2d 521 (1992) (upholding motion to dismiss borrower's negligent misrepresentation claim); *Waller v. Maryland Nat'l Bank,* 95 Md.App. 197, 620 A.2d 381 (1993) (upholding summary judgment against borrower's negligence claim), *rev'd on other grounds,*

The Court finds the *High* case, Siena's sole authority directly on point, to be short on analysis—in fact there is none at all—since it merely asserts that the holding of *Jacques* is as Siena contends. On the other hand, at least one case relied on by Wexford seems distinguishable from the case at hand. In *Parker v. Columbia Bank, supra,* the Court of Special Appeals expressly distinguished *Jacques:*

> In pressing these claims, the Parkers heavily rely upon Jacques v. First Nat'l Bank, supra. There, the Court of Appeals held that a bank, which contracted for a specified fee to process a residential loan application, was required to "use reasonable care" in doing so. Id. at 540, 515 A.2d at 762. Thus, as Judge McAuliffe carefully explained for the Court in Jacques, the basis for the duty of care was an express, albeit oral, contract. As we have held, supra, here Columbia did not breach its contract with the Parkers. Accordingly, unlike Jacques, no contractual promise provides a predicate for a tort duty of reasonable care here.

91 Md.App. at 532, 605 A.2d at 195–96.

The *Parker* court went on to explore the "special circumstances" that might establish that the bank owed its customer a duty "over and above any contractual obligations," 91 Md.App. at 369, 604 A.2d at 532–33, ultimately finding none in the case before it.

Two cases from the United States District Court for the District of Maryland, however, do provide solid support for Wexford's interpretation of *Jacques.*

In *G & M Oil Co. v. Glenfed Fin. Corp.,* 782 F.Supp. 1078 (D.Md.1989), Judge Ramsey of this Court noted that the

*Jacques* court had referred to "the rather extraordinary provisions contained in the real estate sales contract ... [that] left the Jacques particularly vulnerable and dependent upon the Bank's exercise of due care." 782 F.Supp. at 1083 (quoting *Jacques,* 307 Md. at 540, 515 A.2d at 756). In the case before him, he found "nothing unusual in the proposed transaction between [the borrower and the lender]. [Borrower] was seeking a fairly standard business loan and was in no way 'particularly vulnerable and dependent upon [lender's] exercise of due care.'" 72 F.Supp. at 1084 (quoting *Jacques,* 307 Md. at 540, 515 A.2d at 756). Continuing, Judge Ramsey observed:

> Unlike the Jacques' proposed transaction with the First National Bank of Maryland, G & M's proposed transaction with Glenfed did not expose G & M to any unusual or extraordinary risk if the deal fell apart.

*Id.*

And further:

> Moreover, the relationship between G & M and Glenfed was decidedly different from the relationship at issue in Jacques. While the Jacques were unrepresented lay persons seeking a home mortgage from their local Bank, G & M was an established business being shepherded through the loan process by undoubtedly competent counsel. The policy rationale of imposing a special duty of care upon professionals who hold themselves out to the general public as possessing special skill to solve complex problems has no application here (citations omitted). Presently before the Court is a financing deal gone awry

332 Md. 375, 631 A.2d 447 (1993); *Howard Oaks, Inc. v. Maryland Nat'l Bank,* 810 F.Supp. 674, 676 (D.Md.1993) (granting 12(b)(6) motion to dismiss borrower's negligent breach of contract and fraud claims).

between two businesses, bargaining at arms length, and with their eyes open. *Id.*

Similarly, in *Howard Oaks Inc. v. Maryland Nat'l Bank*, 810 F.Supp. 674 (D.Md. 1993), Judge Smalkin of this Court dismissed a cause of action for negligent processing of a loan brought under *Jacques* on the grounds that there was no allegation of "extraordinary circumstances (such as those in *Jacques* involving purchase of a personal residence). Rather, this was merely a commercial financing arrangement between a bank and its sophisticated business customer, in which no *Jacques* duty inhered." 810 F.Supp. at 677–78.

■ Having reflected on the matter, the Court accepts the reading of *Jacques* that Judges Ramsey and Smalkin, and now Wexford, have given it. In the first place, as has been noted many times, "[w]hat . . . the courts [have] actually done with the particular principle, and not what they should have done with it, is the crucial test of stare decisis." [6] Beyond that, the Maryland Court of Appeals has continuously affirmed—as recently as 1999 in *Jones v. Hyatt Ins. Agency, Inc.*—that a "contractual obligation, by itself, does not create a tort duty." 356 Md. 639, 741 A.2d 1099 (1999) (quoting *Mesmer v. M.A.I.F.*, 353 Md. 241, 253, 725 A.2d 1053,1058 (1999)); *see also Jacques*, 307 Md. at 534, 515 A.2d at 759 ("Nor does a duty assumed or implied in contract by that fact alone become a tort duty").

Finally, Wexford makes what the Court finds to be the most compelling argument of all, that the *Jacques* court, "[h]aving therefore found that a contract was created between the parties, and that this contract included an implied promise to use reasonable care," thereafter turned to a further consideration, which was "whether a concomitant tort duty should be recognized *under these circumstances.*" 307 Md. at 540, 515 A.2d at 762 (emphasis added). The court then went on to recite the "extraordinary financing provisions" in the borrowers' real estate contract and their "particularly vulnerable and dependent" status *vis-a-vis* the bank. *Id.* If these factors have no bearing on the matter, then why discuss them?

■ The Court therefore agrees with Judges Ramsey and Smalkin that a lender in Maryland owes no duty in tort to reasonably process a loan, absent extraordinary risk or particular vulnerability or dependency on the part of the borrower. Accordingly, it finds that Wexford owed no duty in tort to Siena in this case. As with the prospective borrower in *G & M*, Siena was an established business being shepherded through the loan process, if not by competent counsel, then by an equally competent mortgage broker. As in *Howard Oaks*, the transaction at bar was merely a commercial financial agreement between a lender and its sophisticated customer. As in *G & M*, what the Court is faced with is nothing more than "a financing deal gone awry between two businesses bargaining at arm's length and with their eyes open." 782 F.Supp. at 1084. And, as in both *G & M* and *Howard Oaks*, under such circumstances, no tort duty can be imposed.

B) Siena suggests, however, that insofar as it may be required to show that it was exposed to extraordinary risk or occupied a position of particular dependence or vulnerability, it has demonstrated those facts. The Court finds no force in this argument. Siena was under no particular financial pressure to obtain a mortgage loan, since the loan it sought to refinance in 1999 was not due to expire until March 2001. More-

**6.** Brumbaugh, Legal Reasoning and Briefing, 171 (1917).

over, its alleged risk—the possibility of having to pay a higher interest rate to another lender if the Wexford loan did not go through—was and is nothing more than the possible consequence of any conventional commercial lending transaction between sophisticated parties that, for one reason or another, fails to materialize.

Nor is it fair argument to say that Siena was contractually limited to pursuing Wexford's loan application or face forfeiting $10,000. While it is true that the $10,000 Expense Deposit could be forfeited as an underwriting fee if Siena "simultaneously" sought financing from another lender, it was otherwise refundable "to the extent that the costs and expenses incurred by [Wexford], or on behalf of [Wexford] by any third party, in connection with analysis or processing of [the loan] application [would be] less than the Expense Deposit." The Expense Deposit was therefore not an application "fee" but, as clearly expressed in the loan application, an advance "to pay third party reporting costs, legal costs, and third party accounting or consulting costs." Among those costs, for example, was the cost of compensating the engineering firm for conducting an appropriate environmental assessment.[7]

The *G & M* case invites comparison. There the loan applicant was less favorably positioned than Siena is here, having paid a $10,000 fee to cover the lender's "field examination and administrative expenses for processing [the] loan request." 782 F.Supp. at 1079. There the lender ultimately rejected the loan application and refused to refund any part of the $10,000

advance. Even so, Judge Ramsey found that the borrower was "seeking a fairly standard business loan" and had not been exposed to "any unusual or extraordinary risk if the deal fell apart." *Id.* at 1084. As a result, no part of the fee was deemed refundable and no tort duty was imposed. The same is true in the present case. A reasonable advance for costs was assessed and a fairly straightforward business loan application failed to go through without any unusual or extraordinary risk to the prospective borrower. As in *G & M*, there is no occasion to impose a duty in tort upon the lender in this case.[8]

C) A final word on Siena's claim of negligence seems appropriate even if not, strictly speaking, necessary. As a matter of law, the Court would find no undue or unreasonable delay on the part of Wexford in processing Siena's application. Although Wexford had several underwriting concerns once the application was filed, its position regarding the environmental site assessment suffices to illustrate how fairly within its rights Wexford was in extending the loan application process as long as it did.

Again, the loan application expressly provided that Wexford would "require satisfactory third party professional reports to be delivered to [it] prior to final consideration of the loan." These reports were "to be in form and substance acceptable" to Wexford. Pursuant to this provision, Wexford commissioned the Phase I engineering report. But it is beyond dispute that, despite the engineers' efforts to resolve the matter, the Maryland Depart-

---

**7.** Wexford points out that less than a month after receiving Siena's application it had incurred $9,450 in third-party fees.

**8.** The $2,500 application fee Siena paid was obviously just that. But the fact that it was paid in no way alters the fact that Siena ran no extraordinary risk nor was it particularly vulnerable or dependent on Wexford in the transaction. Nor indeed, as the next section of the Opinion concludes, does it change the fact that, as a matter of law, Wexford in no way acted unreasonably in processing Siena's loan application.

ment of Environment was unwilling to sign off with regard to possible contamination left by the 1,000 gallon gasoline tank that was presumably removed in 1988. While the engineers doing the site evaluation for Wexford, based on the laboratory results for the soil and ground water testing reported in 1988 and their own visual inspection in 1999 may have advised that they did "not consider the former on site tank(s) to be an environmental concern," Wexford's underwriter Patty Davis continued to express Wexford's concern with this state of affairs as late as August 1999. The letter from the MDE that arrived the first part of September did nothing to reassure Wexford. In consequence, Wexford was fully justified in citing the environmental issue, among others, as a reason why it was not prepared to go forward with the loan commitment.

Siena's mortgage broker expert, Tracy Beers, has testified that, while "puzzled" by the MDE's response regarding the UST, he does not believe it was a "red hot environmental issue" and that, in his experience, the issue "would not preclude the lender from issuing [a] commitment letter." The implication of this statement, of course, is that by not overlooking the issue, Wexford was acting negligently in processing Siena's loan application.

Yet at the same time, it is incontestable that, by performing only slightly more extensive testing of the site by taking soil borings and the like—the so-called Phase II assessment—Siena could have put the matter to rest at a cost of $3,000 to $4,000 within 10 or so days. This Siena declined to do because, according to Hankin, Wexford "never told us how much they were willing to lend over what term and at what interest rate." But, in fact, on May 21, 1999, Wexford had issued its preliminary commitment letter conditionally agreeing to lend Siena $2.959 million subject to an interest rate spread tied to the rate for "10 Year U.S. Treasuries, subject to change in market conditions for loans of this type and approval of Lender's Loan Committee." To the extent that the final interest rate was subject to change based on changed conditions, by performing the Phase II assessment, Siena unquestionably had it within its power to press the loan to an earlier closing date.

By late July 1999, however, when it had its lawyer write to Wexford implying, if not outright suggesting, that a lawsuit was imminent, Siena was clearly more disposed to clash than close. Indeed the present lawsuit was filed on September 29, 1999, just 4 weeks after the MDE indicated that it was unable to definitively approve the environmental condition of the shopping center site.

Wexford acted entirely within its rights when it declined to commit. Siena, on the other hand, regardless of how Hankin and Siena may have felt about Wexford's real intentions, had no basis at all to refuse to fulfill express conditions of the loan application.

## IV.

■ A) Siena also fails in its claim of negligent misrepresentation. As with ordinary negligence, negligent misrepresentation in the context of a failed loan transaction presupposes the existence of a duty on the part of the lender. *See Parker*, 91 Md.App. 346, 604 A.2d 521. While in the negligence context the duty is cast as one in tort after the fashion of *Jacques*, in the negligent misrepresentation context it is fiduciary in nature. *Id.*

■ But, as the Court has already observed, for a tort duty to come into play, extraordinary circumstances above and beyond contractual privity are required. For a fiduciary duty to exist, "special circum-

stances over and above any contractual obligations" must exist. *Id.* at 369, 604 A.2d at 532. Among those special circumstances, as established by *Parker,* are (1) assumption by the lender of extra services over and above the contractual obligation and (2) receipt by the lender of economic benefits other than those accruing to the ordinary mortgage. *Id.* at 371–72, 604 A.2d at 533–34.

Viewing *Jacques* and *Parker* together, the former dealing with negligence and the latter with negligent misrepresentation, it is apparent that they travel an essentially identical analytical path. Circumstances above and beyond contractual privity must be present before any duty comes into play.

But, just as the Court has found no extraordinary circumstances or particular vulnerability or dependence insofar as the *Jacques* cause of action is concerned, it finds no special circumstances that call into being the fiduciary duty described in *Parker.* Both Siena's President Hankin and its mortgage broker Rozga have conceded that Wexford assumed no services other than "the normal investigations, evaluations and inspections that a prudent lender makes." *Parker,* 91 Md.App. at 371, 604 A.2d at 533. At the same time, Wexford did not stand to gain any benefit beyond the mortgage loan itself, as *Parker* requires. Accordingly, the Court concludes that Wexford owed Siena no fiduciary duty for purposes of positing a cause of action for negligent misrepresentation.

B) As with Siena's claim of negligence, a further word on the alleged misstatements by Wexford's agents seems in order.

In its Complaint, Siena alleges multiple misrepresentations on the part of Wexford, specifically by Tucker, to wit: that Siena could qualify for a loan sufficient to refinance the shopping center loan; that the loan had been approved; and that Wexford would issue a commitment letter "in the foreseeable future." In its Opposition to Wexford's Motion for Summary Judgment, Siena does little to elucidate these allegations, citing its own interrogatory answers and deposition testimony which, when consulted, lend minimal support to the allegations.

In fact, on the merits the alleged misrepresentations come quickly to naught. If Siena has not already abandoned its claim that Tucker's statement that Siena would qualify for a loan sufficient to refinance the shopping center amounted to negligent misrepresentation, there can be no question that under the loan application the "terms and conditions of the Loan ... [could] vary from those contained in [the] Application due to underwriting due diligence, loan committee requirements and/or market interest rate changes." Further, to the extent that Tucker may have told Siena's representatives that the loan had been or would be approved at any given time, even if he spoke carelessly, it is clear that the loan application contained overriding language:

> Applicant acknowledges and agrees that nothing contained herein, and no prior or subsequent communication from Lender to Applicant, whether written or verbal, shall be deemed or construed to constitute or imply a commitment or offer by Lender to make the Loan, and no such commitment or offer shall exist unless and until Lender expressly executes a Loan Commitment or offer in writing and delivers such Loan Commitment or offer to the Borrower.

In light of these considerations, there is simply no basis for a claim of negligent misrepresentation.

## V.

Ultimately, Wexford's perspective in this case is the correct one. Siena was a sophis-

ticated real estate developer with broad experience in commercial and mortgage loan transactions. It made a straightforward, arms length application for a loan, the terms of which gave the lender the right to insist upon adequate due diligence and other underwriting requirements. For whatever reason or reasons, in the course of the transaction Siena took the position that certain of Wexford's concerns were inconsequential and that, because other lenders would have been more accommodating than Wexford, it should have been more accommodating. But the issue is not whether Wexford could have gone along with the proposed transaction. What matters is whether, under all the circumstances, particularly in view of the express limiting language of the loan application, Wexford was obliged to do so.

For the reasons stated, the Court holds that it was not.

The Court will GRANT Wexford's Motion for Summary Judgment.

A separate Order will be ENTERED implementing this Opinion.

### FINAL ORDER OF JUDGMENT

Upon consideration of the Motion of Defendant Wexford Bancgroup, LLC for Summary Judgment and the Opposition of Plaintiff Silver Hill Station Limited Partnership thereto, it is for the reasons set forth in the accompanying Opinion this 30th day of July, 2001

ORDERED:

1) Defendant Wexford's Motion for Summary Judgment is GRANTED;

2) Summary Judgment is ENTERED in favor of Defendant Wexford and against Plaintiff Silver Hill;

3) The Clerk of Court shall CLOSE this case.